# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

BARBARA HENNIS  
o/b/o J.W. (a minor),

      **Plaintiff,**

  v.                                     Civil Action 2:18-cv-422  
                                              Magistrate Judge Kimberly A. Jolson

COMMISSIONER OF SOCIAL  
SECURITY,

      **Defendant.**

## OPINION AND ORDER

Plaintiff, Barbara Hennis, acting on behalf of J.W., a minor, filed this action seeking review of a decision of the Commissioner of Social Security denying J.W.'s application for supplemental security income. For the reasons that follow, the Commissioner's non-disability finding is **REVERSED**, and this case is **REMANDED** to the Commissioner and Administrative Law Judge under Sentence Four of § 405(g).

## I. BACKGROUND

Plaintiff is J.W.'s maternal grandmother, who filed an application for supplemental security income on his behalf on June 24, 2014, alleging he became disabled on September 1, 2011, due to Attention Deficit Hyperactivity Disorder ("ADHD"), anxiety disorder, social phobia, and post-traumatic stress disorder. (Doc. 14, Tr. 27, 243, PAGEID #: 77, 296). After initial administrative denials of the claim, an Administrative Law Judge ("ALJ") held a hearing on March 9, 2017. (Tr. 48–88, PAGEID #: 98–138). Both Plaintiff and J.W. testified. (*Id.*). The ALJ issued a decision denying benefits on June 29, 2017. (Tr. 24–41, PAGEID #: 74–91).

Plaintiff filed this action on May 1, 2018 (Doc. 1), and the Commissioner filed the administrative record on August 13, 2018 (Doc. 14). Plaintiff filed a Statement of Specific Errors (Doc. 19), the Commissioner responded (Doc. 20), and no reply was filed.

**A.     Personal Background**

J.W. was born on June 16, 2005 (Tr. 27, PAGEID #: 77), and Plaintiff has had custody of him since June 29, 2011, because of his mother's drug use. (Tr. 240, PAGEID #: 293; Tr. 73, PAGEID #: 123).

**B.     Hearing Testimony**

At the time of the administrative hearing, J.W. was 11 years old. (Tr. 56, PAGEID #: 106). J.W. testified that he lives in a two-bedroom home with his grandparents and pets. (Tr. 57, PAGEID #: 107). He stated that he likes to play on the computer and play outside with friends. (*Id.*) J.W. reported that he has four friends in his neighborhood, including his best friend. (Tr. 58, PAGEID #: 108).

J.W. testified that he is "[s]ometimes" able to take care of himself in the morning, including brushing his own hair, washing his hands, brushing his teeth, and making breakfast. (Tr. 58–59, PAGEID #: 108–09). For chores, he testified that he cleans his room and sometimes feeds his cats. (Tr. 60, PAGEID #: 110). He further stated that he cannot tie his own shoes or cook on the stove. (Tr. 58–60, PAGEID #: 108–10). J.W. testified that he takes medicine for tics. (Tr. 61, PAGEID #: 111).

J.W. testified that he is in fifth grade and that his favorite subjects are recess and lunch. (Tr. 61–62, PAGEID #: 111–12). J.W. testified that: his grades are "getting better"; he likes to read and draw; and his least favorite subject is math. (Tr. 62–63, PAGEID #: 112–13). He

reported, however, that he struggles to complete his daily homework and "[s]ometimes" his grandma forces him to complete his homework, but not often. (Tr. 63–64, PAGEID #: 113–14).

J.W. testified that he generally gets along with kids in his class, except for one student who is "always messing with other students." (Tr. 64–65, PAGEID #: 114–15). He likes all of his teachers. (Tr. 65, PAGEID #: 65). J.W. reported that he has not been suspended during the current school year but had been suspended the previous school year for four days. (*Id.*).

Plaintiff then testified regarding J.W.'s development and his physical and mental impairments. She reported that J.W. does not do a lot of chores and cannot tie his shoes. (Tr. 67, PAGEID #: 117). Plaintiff testified that she and her husband have to give J.W. medication every morning and night because he forgets to take it on his own. (*Id.*). Plaintiff reported that she picks out J.W.'s clothes every night and that she has to supervise him getting ready in the morning. (Tr. 67–68, PAGEID #: 117–18). If she does not tell him repeatedly to perform basic personal care, J.W. forgets. (Tr. 68, PAGEID #: 118).

Regarding J.W.'s performance at school, Plaintiff testified that "[t]his year he's doing pretty good." (Tr. 69, PAGEID #: 119). She stated that his performance in school the previous year had been poor and that he still struggles to pay attention and stay on task. (*Id.*). Plaintiff testified that J.W.'s medications have improved his behavior. (Tr. 69–70, PAGEID #: 119–20). Further, she testified that Plaintiff still has a rough time with school work: His handwriting is hard to read; he struggles to concentrate; and it is "almost impossible" for him to write a sentence without constant supervision and direction. (Tr. 70, PAGEID #: 120). Plaintiff reported that J.W. struggles the most with math, which she described as "a disaster for him," and she testified that he is below average in social studies and science. (Tr. 71, PAGEID #: 121).

3

Plaintiff described J.W.'s relationship with her and J.W.'s mother. According to Plaintiff, when J.W. was young, his mother used crack cocaine and engaged in prostitution. (Tr. 72, PAGEID #: 122). J.W.'s mother lost her parental rights to J.W., and J.W. does not like to have contact with her. (*Id.*).

Plaintiff testified that J.W. feels secure with her and her husband but that he is "not real big on friends." (Tr. 74, PAGEID #: 124). She stated that he plays with his friends a couple of times per week. (*Id.*).

Plaintiff described J.W.'s physical and mental impairments. She testified that J.W. has ADHD and PTSD and that he suffers from tics that cause involuntary verbal expression and physical movements. (Tr. 75–76, PAGEID #: 125–26). J.W. takes medication to address these impairments and also takes additional medication to help him sleep and deal with potential hallucinations. (Tr. 76, PAGEID #: 126).

Under questioning from the ALJ, Plaintiff testified regarding J.W.'s relationship with his friends. She testified that his best friend is three years younger than him. (Tr. 78, PAGEID #: 128). Further, she stated that J.W. often fights with his other friends that live in his neighborhood. (Tr. 78–79, PAGEID #: 128–29).

Plaintiff testified that J.W.'s behavior at school had improved, but that he still has the same difficulties with his attention and staying on task. (Tr. 81–82, PAGEID #: 131–32). The school provides a teacher's aide to work specifically with J.W., and he attends two special education classes. (Tr. 82, PAGEID #: 132).

C.    **Educational Evidence**

J.W. has had an Individualized Education Program ("IEP") since kindergarten. (Tr. 255, PAGEID #: 309). As reflected in his 2013 IEP review, he was diagnosed with Attention Deficit

4

Hyperactivity Disorder ("ADHD"). (*Id.*). The evaluator observed that J.W. had below average motor skills (Tr. 258, PAGEID #: 312), and required occupational therapy at school to develop his fine motor skills, (Tr. 256, PAGEID #: 310). Further, the evaluator opined that J.W. was unable to complete schoolwork without frequent prompting because he was easily distracted. (Tr. 262, PAGEID #: 316). Generally, J.W. required "15-17 reminders" to complete a 30-minute assignment. (*Id.*).

J.W. also struggled to control his anger. (Tr. 264, PAGEID #: 318). He frequently got frustrated and refused to follow directions, pounded his desk, and yelled at classmates. (*Id.*). The evaluator stated these behaviors were atypical for second-graders. (*Id.*). The evaluator found that J.W. qualified for special education services because of his ADHD, emphasizing J.W.'s "extreme difficulty" functioning in a regular classroom. (Tr. 318, PAGEID #: 372).

The observations of J.W.'s teachers supported this conclusion. His teachers noted that Plaintiff was easily angered and upset if he did not get his way and that he struggled to regain focus after he became upset. (Tr. 346, PAGEID #: 400). As a result, he struggled to follow instructions. (*Id.*). Further, he bossed around his peers and struggled to make friends. (*Id.*).

J.W. was also suspended on two separate occasions in 2013 and 2014 after getting in physical altercations with other students. (Tr. 372, PAGEID #: 426; Tr. 378, PAGEID #: 432). On both occasions, he was suspended from school for a day. (*Id.*).

Between November 2014 and April 2017, three elementary school teachers completed questionnaires regarding J.W.'s functional capabilities. (Tr. 408–09, PAGEID #: 462–63; Tr. 1202–05; PAGEID #: 1259–62). J.W.'s third grade teacher, J.K., indicated that he needed academic accommodations and a separate room for him to attend small group instruction "or to cool down." (Tr. 408, PAGEID #: 462). She opined that J.W. was average in reading but below

5

average in the following areas: attention span and concentration in class, ability to follow instructions, ability to work independently of teacher supervision, ability to understand and complete assignments on time, ability to respond to changes of routine, ability to respond to criticism, and ability to progress in learning the skills involved in writing and mathematics. (*Id.*). J.K. further observed that J.W. had difficulty in functioning "in unstructured areas," including recess and lunch. (Tr. 409, PAGEID #: 463). According to her, J.W. wanted to tell other students what to do and frequently expressed concern that other people were staring at him. (*Id.*).

J.W.'s fourth grade language arts teacher, A.K., stated that he needed accommodations for writing because his physical handwriting was illegible. (Tr. 1204, PAGEID #: 1261). Like J.K., she found that J.W. was below average in a number of areas, including: attention span and concentration in class, ability to follow instructions, ability to work independently of teacher supervision, ability to understand and complete assignments on time, ability to respond to criticism, and ability to progress in learning the skills involved in writing and mathematics. (*Id.*). With respect to his attention span, A.K. specifically noted that J.W. "needs an aide to sit next to him to complete anything and stay focused." (*Id.*). She also opined that J.W. was average in his ability to respond to changes of routine and "average/high average" in reading. (*Id.*). With respect to J.W.'s behavioral issues, A.K. observed that J.W. was "[v]ery paranoid, says hears voices, and that people are always looking at him." (Tr. 1205, PAGEID #: 1262). She further stated that J.W. was argumentative with his peers and was constantly worried that they were making fun of him. (*Id.*). A.K. noted that J.W. did not exhibit age-appropriate hygiene and self-care and that his appearance was often disheveled. (*Id.*). She also observed that J.W. had ADHD and weak motor skills. (*Id.*).

A.R., J.W.'s fifth grade teacher, submitted a similar evaluation. (Tr. 1202–03, PAGEID #: 1259–60). She noted that J.W. used a computer instead of writing by hand, received small group instruction, and saw an intervention specialist for math and writing. (Tr. 1202, PAGEID #: 1259). A.R. opined that J.W. was very weak in his ability to follow instructions, to work independently of teacher supervision, and to understand and complete assignments on time; weak in his attention span and concentration in class and in his ability to respond to criticism; below average in his math and writing skills; average in his ability to respond to changes of routine; and above average in his reading abilities. (*Id.*). She stated that J.W. was "somewhat aggressive when defending a friend" and that he was below average in his ability to get along with his peers. (Tr. 1203, PAGEID #: 1260). According to A.R., J.W. often believed other students' actions were malicious when they were not. (*Id.*). She also noted that J.W. needed directions provided three or more times "before taking appropriate steps" and that he often clenched his jaw and exhibited facial tics. (*Id.*).

**D.     Relevant Medical Evidence**

During the relevant time-period, J.W.'s treating physician was Marilyn Peters, M.D., a child psychologist. In October 2013, Dr. Peters met with J.W., Plaintiff, and J.W.'s grandfather for a pharmacologic management evaluation. (Tr. 1246–1248, PAGEID #: 1304–06). She noted that Plaintiff was being treated for ADHD and dyssomnia with a history of adjustment and mood problems. (Tr. 1246, PAGEID #: 1304). Dr. Peters reported that Plaintiff was doing "very well" in second grade, but was still impulsive and easily distracted. (*Id.*). She further stated that his social skills were "much improved." (*Id.*). Dr. Peter diagnosed Plaintiff with ADHD and dyssomnia and noted the need to monitor J.W. for mood disorder based on his history of adjustment disorder with mixed disturbances of emotions and conduct. (Tr. 1247, PAGEID #: 1305).

In June 2014, Dr. Peters stated that J.W. had been having "a bit more difficulty with ADHD," but that Plaintiff believed he was "functioning very well," noting that he was socializing with other children in the neighborhood and performing chores. (Tr. 1257–58, PAGEID #: 1315–16). Dr. Peters observed that J.W. was more "interactive," "playful," "relaxed," and "motivated" than at prior appointments. (Tr. 1247, PAGEID #: 1315).

On November 9, 2015, Joe Hatcher, Ph.D., a clinical child psychologist completed a psychological assessment of J.W. (Tr. 1280–85, PAGEID #: 1338–43). Dr. Hatcher evaluated J.W. over the course of two sessions. (Tr. 1280, PAGEID #: 1338). He noted that J.W. was appropriately dressed and groomed and that he put forth good effort during the assessment. (*Id.*). Dr. Hatcher observed that J.W. displayed periodic motor tics when discussing his experience with hallucinations. (*Id.*). According to Dr. Hatcher, J.W. experienced periods of intense anxiety and vigilance that were "impairing." (Tr. 1281, PAGEID #: 1339). He also noted that J.W. experienced visual hallucinations but did not exhibit any other symptoms of psychosis. (*Id.*). Stress and anxiety exacerbated J.W.'s physical tics. (*Id.*).

Dr. Hatcher diagnosed J.W. with ADHD, anxiety disorder, and tic disorder. (*Id.*). He further noted the need to rule out PTSD. (*Id.*). Because J.W. displayed "severe symptoms and problematic behavior at home and school," Dr. Hatcher recommended that he receive additional services at school and at home. (*Id.*).

After changing practices, Dr. Peters continued to treat J.W. In December 2015, Dr. Peters stated that she had started J.W. on a new medication, Risperdal, in October due to his aggressive behavior and overactivity at school. (Tr. 1296, PAGEID #: 1354). Since J.W. ran out of Risperdal, he had begun experiencing sleep-related visual hallucinations and physical tics. (*Id.*). J.W. reported that he was "much happier" on Risperdal. (*Id.*). In addition to ADHD and dyssomnia,

Dr. Peters diagnosed J.W. with chronic motor tic disorder and noted that he had problems socializing with his peers and academically. (Tr. 1299, PAGEID #: 1357).

On January 19, 2016, Dr. Peters completed a questionnaire on medical and functional equivalence. (Tr. 1302–05, PAGEID #: 1360–63). She found that J.W. had marked limitations in attending and completing tasks and with his health and physical well-being. (Tr. 1303–04, PAGEID #: 1361–62). Dr. Peters further concluded that J.W. had moderate limitations in interacting and relating with others and caring for himself. (*Id.*). She deferred to J.W.'s school's assessment of his ability to acquire and use information and to move about and manipulate objects. (Tr. 1302–03, PAGEID #: 1360–61). Dr. Peters opined that J.W. had "chronic, ongoing ADHD" and "tics" with "tics intermittently/episodically exacerbated in their natural course." (Tr. 1304, PAGEID #: 1362).

At an appointment on March 8, 2016, Dr. Peters noted that J.W.'s teachers had observed more severe ADHD symptoms and increased tic-related movements. (Tr. 1599, PAGEID #: 1658). J.W.'s teachers specifically noted that he was having "difficulty focusing." (*Id.*). Treatment notes from later in November 2016 indicate that Plaintiff was "thriving." (Tr. 1616, PAGEID #: 1675). Dr. Peters reported that J.W.'s grades were "great" and that he had good relationships with his friends and teacher. (*Id.*). Nonetheless, J.W.'s teacher noted that he was still having attention problems and that he was lagging in written expression, following directions, and organizing. (*Id.*).

At a January 24, 2017 appointment, Plaintiff reported that J.W.'s grades had "really improved" and that his behavioral problems had decreased. (Tr. 1652, PAGEID #: 1711). Dr. Peters expressed concern about J.W.'s lapse in counseling. (*Id.*). She observed that J.W. was pleasant and seemed much more aware of social cues than in the past. (Tr. 1654, PAGEID #: 1713).

9

On February 14, 2017, Dr. Peters completed a new questionnaire on medical and functional equivalence. (Tr. 1677–80, PAGEID #: 1736–39). She opined that J.W. had marked limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others. (Tr. 1677–78, PAGEID #: 1736–37). Dr. Peters concluded that J.W. had a moderate limitation in his health and well-being. (Tr. 1679, PAGEID #: 1738). She further found that there was no evidence of limitations in J.W.'s ability to move about and manipulate objects or to care for himself. (Tr. 1678–79, PAGEID #: 1737–38). She noted that J.W. continued to suffer from ADHD, anxiety, and tics that fluctuated over time. (Tr. 1679, PAGEID #: 1738).

### E. The ALJ's Decision

The ALJ first found that J.W. was a school-age child when the application was filed and an adolescent as of the date of the decision. (Tr. 27, PAGEID #: 77). Next, he found that J.W. had not engaged in substantial gainful activity since his alleged onset date. (*Id.*). At the next step of the sequential evaluation process, the ALJ concluded that J.W. had severe impairments including attention deficit hyperactivity disorder (ADHD), anxiety disorder, specific phobia, and post-traumatic stress disorder (PTSD). (*Id.*). He also found that J.W.'s impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments, or functionally equal those requirements. (Tr. 28, PAGEID #: 78).

The ALJ then reviewed J.W.'s educational records, J.W.'s medical records, and the opinion evidence contained in the record. (Tr. 30–34, PAGEID #: 80–84). Relevant here, he reviewed the opinion evidence of three of J.W.'s elementary school teachers:

> [J.K], the claimant's third grade teacher, opined in November 2014 that the claimant's classroom abilities were overall below average, other than in reading, where she found him average. [A.K.], the claimant's fourth grade teacher, opined in April 2017 that the claimant's classroom abilities were mostly below average, except that she found him: to be average in responding to changes in routine; to be average/high average in reading; to be average in keeping with peers in

10

extracurriculars; and to have difficulty getting along with peers, but fine with teachers. She also stated the claimant had problems with hair-washing, uncleanliness, smelling of smoke, etc. She further opined that the claimant had weak motor skills which limited his ability to function at school. [A.R.], the claimant's fifth grade teacher, stated in March 2017 that the claimant's classroom abilities were mostly weak or very weak, except that she found him: merely "below average" in math and writing, as well as in getting along with peers; average in responding to changes in routine; and above average in reading. She also noted average hygiene and self-care. As teachers, these three are professionals in the area of child development, and have had extensive opportunity to observe the claimant and his functioning. Their opinions are largely consistent with the claimant's educational records as described above—the observations detailed there, the claimant's grades, etc. I give [J.K.'s] and [A.R.'s] opinions great weight. There is no real support in the record for such significant personal care difficulties as [A.K.] indicates; I give her opinion partial weight.

(Tr. 32–33, PAGEID #: 82–83).

In reviewing the six domains of functioning that are pertinent to a child's benefits application, the ALJ determined that J.W. had less than marked limitation in: acquiring and using information, attending and completing tasks, interacting and relating with others, and health and physical well-being. (Tr. 34–38, PAGEID #: 84–88; Tr. 40–41, PAGEID #: 90–91). Further, the ALJ found that J.W. had no limitations in moving about and manipulating objects and in caring for himself. (Tr. 38–40, PAGEID #: 88–90). Because a finding of one "extreme" limitation or two "marked" limitations is needed in order to support an award of benefits, the ALJ denied Plaintiff's claim. (Tr. 41, PAGEID #: 91).

## II. STANDARD OF REVIEW

The Sixth Circuit has summarized the regulations concerning a child's application for disability benefits, stating:

> The legal framework for a childhood disability claim is a three-step inquiry prescribed in 20 C.F.R. § 416.924. The questions are (1) is the claimant working, (2) does the claimant have a severe, medically determinable impairment, and (3) does the impairment meet or equal the listings? * * * An impairment can equal the listings medically or functionally * * *. The criteria

11

> for functional equivalence to a listing are set out in § 416.926a. That regulation divides function up into six "domains":
>
> (1) Acquiring and using information;
> (2) Attending and completing tasks;
> (3) Interacting and relating with others;
> (4) Moving about and manipulating objects;
> (5) Caring for yourself; and
> (6) Health and physical well-being.
>
> § 416.926a(b)(1). To establish a functional impairment equal to the listings, the claimant has to show an extreme limitation in one domain or a marked impairment in more than one. § 416.926a(d). Lengthy definitions for marked and extreme are set out in § 416.926a(e). Each includes instructions on how to use test results:
>
> "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.
>
> § 416.926a (e)(2)(i).
>
> "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.
>
> § 416. 926a (e)(3)(i).

*Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 832 (6th Cir. 2009).

In the context of that legal framework, this Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The

Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff asserts two assignments of error: (1) the ALJ erred in evaluating the assessments provided by J.W.'s elementary school teachers (Doc. 19 at 12–16), and (2) the ALJ erred in his evaluation J.W.'s treating physician (*Id.* at 16–18). Because the first assignment of error has merit, the Court does not reach the second assignment of error.

Under the regulations, teachers are considered "other sources," rather than acceptable medical sources. SSR 06–3p, 2006 WL 2329939, at *1–2.[1] Although information from other sources cannot establish the existence of an impairment, it "may provide insight into the severity of the impairment," and how it affects the individual's ability to function. *Id.* at *2–3. In evaluating the opinions of "other sources," an ALJ should consider a number of factors, including how long the source has known the claimant, how consistent the source's opinion is with other evidence, and how well the source's opinion is explained. *Id.* at *5–6. Further, an ALJ:

> generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case.

*Id.* at *6.

---

[1] "SSR 06-3p has been rescinded in keeping with amendments to the regulations that apply to claims filed on or after March 27, 2017, and the rescission is effective for claims filed on or after that date." *Hoffman v. Comm'r of Soc. Sec.*, 2019 WL 697788, at *7 (S.D. Ohio Feb. 20, 2019) (citing 82 FR 15263-01, 2017 WL 1105348 (March 27, 2017)). Because Plaintiff's claim was filed before the effective date of the rescission, SSR 06-3p applies here.

The ALJ generally complied with these regulatory requirements. He reviewed the opinions of J.K., A.K., and A.R. and considered how long they had known the claimant, how consistent their opinions were with other evidence, and how well they explained their opinions. (*See* Tr. 32–33, PAGEID #: 82–83). The ALJ correctly emphasized that, "[a]s teachers, these three are professionals in the area of child development, and have had extensive opportunity to observe the claimant and his functioning" and opined that "[t]heir opinions are largely consistent with the claimant's educational records." (Tr. 33, PAGEID #: 83). Therefore, he concluded, J.K.'s and A.R.'s opinions were entitled to great weight. (*Id.*). The ALJ further found that A.K.'s opinion was entitled to partial weight, apparently discounting only her opinion as to J.W.'s limitations with respect to personal care. (*See id.* ("There is no real support in the record for such significant personal care difficulties as [A.K.] indicates; I give her opinion partial weight.")).

But the ALJ did not satisfy a more fundamental obligation: "As a rule, the ALJ must build an accurate and logical bridge between the evidence and his conclusion." *Waye v. Comm'r of Soc. Sec.*, No. 1:18-CV-201, 2019 WL 364258, at *5 (S.D. Ohio Jan. 30, 2019) (citing *Wilson v. Comm. of Soc. Sec.*, 378 F.3d 541, 544–546 (6th Cir. 2004); *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011)). Here, the ALJ failed to build a logical bridge between his finding that J.K.'s and A.R.'s opinions were entitled to great weight and his conclusion that J.W. did not have any marked or extreme limitation in any of the six functional equivalence domains.

Both J.K.'s and A.R.'s opinions provide support for the conclusion the J.W. had marked or extreme limitations in some of the six functional equivalence domains. For example, one of the domains is attending and completing tasks. As the Social Security Administration has explained:

> In the domain of "Attending and completing tasks," we consider a child's ability to focus and maintain attention, and to begin, carry through, and finish activities or tasks. We consider the child's ability to initiate and maintain attention, including the child's alertness and ability to focus on an activity or task despite

14

distractions, and to perform tasks at an appropriate pace. We also consider the child's ability to change focus after completing a task and to avoid impulsive thinking and acting. Finally, we evaluate a child's ability to organize, plan ahead, prioritize competing tasks, and manage time.

The ability to attend and to complete tasks develops throughout childhood, evolving from an infant's earliest response to stimuli, such as light, sound, and movement, to an adolescent's completion of academic requirements. Over time, this evolution can be seen in the steady development of a child's ability to attend and to complete increasingly complex tasks.

. . .

As in any domain, when we evaluate a child's limitations in the domain of "Attending and completing tasks," we consider how appropriately, effectively, and independently the child functions compared to children of the same age who do not have impairments. For example, a teacher may report that a child "pays attention well with frequent prompting." The need for frequent prompting demonstrates that the child is not paying attention as appropriately, effectively, or independently as children of the same age who do not have impairments. Despite the fact that the child is paying attention with prompting, this child is not functioning well in this domain.

SSR 09-4P, 2009 WL 396033, at *2. As examples, the Social Security Administration cited children with ADHD:

- Children with attention-deficit/hyperactivity disorder (AD/HD) whose primary difficulty is inattention may be easily distracted or have difficulty focusing on what is important and staying on task. They may fail to pay close attention to details and make careless mistakes in schoolwork, avoid projects that require sustained attention, or lose things needed for school or other activities beyond what is expected of children their age who do not have impairments.

- Children with AD/HD whose primary difficulty is hyperactivity and impulsivity may fidget with objects instead of paying attention, talk instead of listening to instructions, or get up from their desks and wander around the classroom beyond what is expected of children their age who do not have impairments.

*Id.* at *3. Limitations in this area can also "result in limitations in the domain of 'Acquiring and using information'; for example, by undermining academic performance." *Id.* at *4.

Both J.K. and A.R. opined that J.W. had significant limitations in his ability to pay attention and concentrate in class, follow instructions, work independently of teacher supervision, and understand and complete assignments on time. (*See* Tr. at 408, PAGEID #: 462; Tr. 1202,

15

PAGEID #: 1259). In fact, A.R. emphasized that J.W. was "very weak" in his "ability to follow instructions," "ability to work independently of teacher supervision," and "ability to understand and complete assignments on time." (Tr. 1202, PAGEID #: 1259). She explained that J.W. needed directions "provided 3 or more times before taking appropriate steps" to complete assignments. (Tr. 1203, PAGEID #: 1260). And while the ALJ discounted A.K.'s opinion regarding J.W.'s personal hygiene, her evaluation was consistent with the opinions expressed by J.K. and A.R. (Tr. 1204–05, PAGEID #: 1261–62). Particularly relevant here, she opined that J.W. needed "an aide to sit next to him to complete anything and stay focused." (Tr. 1204, PAGEID #: 1261). Significantly, J.K.'s, A.K.'s, and A.R.'s opinions were consistent with J.W.'s educational records. (*See* Tr. 262, PAGEID #: 316 (observing that J.W. was unable to complete schoolwork without frequent prompting because he was easily distracted and that he required "15-17 reminders" to complete a 30-minute assignment); Tr. 318, PAGEID #: 372 (recognizing that J.W. qualified for special education services because of his ADHD and emphasizing J.W.'s "extreme difficulty" functioning in a regular classroom)).

These opinions provide support for the conclusion that J.W. had a marked or extreme limitation in attending and completing tasks. *Cf.* SSR 09-4P, 2009 WL 396033, at *2 (summarizing factors to be considered in evaluating the domain of attending and completing tasks). So too with respect to the acquiring and using information domain. *See id.* at *4 (providing that limitations in the area of attending and completing tasks can also "result in limitations in the domain of 'Acquiring and using information'; for example, by undermining academic performance.").

Despite assigning the opinions of J.K. and A.R. great weight, the ALJ concluded otherwise. (*See* Tr. 34–41, PAGEID #: 84–91 (finding no marked or extreme limitation in any of the six

domains)). But having assigned great weight to the opinions of J.K. and A.R., the ALJ was required to "build an accurate and logical bridge between [that] evidence and his conclusion" that J.W. had no marked or extreme limitation in any of the six domains. *Waye*, 2019 WL 364258, at *5 (citations omitted). The ALJ's limited analysis did not satisfy that standard. (*See, e.g.*, Tr. 36–37, PAGEID #: 86–87 ("The claimant has less than marked limitation in attending and completing tasks. The observations of teachers and other education professionals and of treatment providers do support some degree of limitation in this area. However, the academic records and psychometric testing discussed under the previous domain have force in this domain as well.")). Remand is, therefore, appropriate here.

Having concluded that Plaintiff's first assignment of error warrants reversal, the Undersigned declines to address the remaining assignment of error. The ALJ may wish to consider Plaintiff's remaining assignment of error on remand if appropriate.

## IV. CONCLUSION

Based on the foregoing, the Commissioner's non-disability finding is **REVERSED**, and this case is **REMANDED** to the Commissioner and Administrative Law Judge under Sentence Four of § 405(g).

IT IS SO ORDERED.


Date:  February 28, 2019                    /s/ Kimberly A. Jolson
                                            KIMBERLY A. JOLSON
                                            UNITED STATES MAGISTRATE JUDGE